IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CONSTANCE BATTAGLIA, | CASE NO. 1:22-CV-01459-DAC |
| Plaintiff, | MAGISTRATE JUDGE DARRELL A. CLAY |
| vs. | **MEMORANDUM OPINION & ORDER** |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

## INTRODUCTION

Plaintiff Constance Battaglia challenges the decision of the Commissioner of Social Security denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On August 16, 2022, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry of Aug. 16, 2022). On August 24, 2022, the parties consented to my exercising jurisdiction under 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (ECF #6). Following review, and for the reasons stated below, I **REVERSE** the Commissioner's decision and **REMAND** the case for additional proceedings consistent with this opinion.

## PROCEDURAL BACKGROUND

Mrs. Battaglia filed for DIB on March 13, 2017, alleging a disability onset date of December 16, 2016. (Tr. 568). The claim was denied initially and on reconsideration. (Tr. 580,

600). Mrs. Battaglia then requested a hearing before an Administrative Law Judge. (Tr. 617-18). Mrs. Battaglia (represented by counsel) and a vocational expert (VE) testified at a hearing before the ALJ on December 12, 2018. (Tr. 534-567). On March 27, 2019, the ALJ issued a written decision finding Mrs. Battaglia not disabled. (Tr. 13-34). The Appeals Council denied Mrs. Battaglia's request for review. (Tr. 1-7).

On April 29, 2020, Mrs. Battaglia appealed the decision to the District Court. (Tr. 1785-95). Upon joint motion of the parties, the District Court remanded the claim to the Commissioner for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g). (Tr. 1796). On February 3, 2021, the Appeals Council remanded the case to the ALJ with instructions to adequately evaluate opinion evidence, specifically the opinions of Van Warren, M.D., Jeffry Brown, D.O., and David Knierim, M.D. (Tr. 1799-1801). Because Mrs. Battaglia filed a subsequent claim for DIB on May 22, 2020, the Appeals Council also directed the ALJ to consolidate the claims and issue a new decision. (Tr. 1801).

Mrs. Battaglia (represented by counsel) and a vocational expert (VE) testified at a second hearing before the ALJ on October 15, 2021. (Tr. 1712-46). On November 12, 2021, the ALJ issued a second written decision finding Mrs. Battaglia not disabled. (Tr. 1663-1711). The Appeals Council denied Mrs. Battaglia's request for review making the hearing decision the final decision of the Commissioner. (Tr.1652-58; *see* 20 C.F.R. §§ 404.955 and 404.981). Mrs. Battaglia timely filed this action on August 16, 2022. (ECF #1).

FACTUAL BACKGROUND

**I.     PERSONAL AND VOCATIONAL EVIDENCE**

Mrs. Battaglia was 50 years old at the alleged onset date and 54 years old at the second administrative hearing. (Tr. 1720). She completed high school. (*Id.*). Before her alleged onset date, Mrs. Battaglia worked as a financial aid counselor. (Tr. 541-42).

**II.    RELEVANT MEDICAL EVIDENCE[1]**

In late 2015, Mrs. Battaglia sought treatment for continued headaches with neurologist Harold Mars, M.D. (Tr. 778-79). In December 2015, Dr. Mars noted Mrs. Battaglia's cervical X-rays showed loss of normal lordotic cervical curve and degenerative joint disease. (Tr. 779). He also observed tightness to the paraspinous muscles. (*Id.*). Dr. Mars continued Mrs. Battaglia's prescriptions for Percodan and Flexeril. (Tr. 780).

On March 19, 2016, Mrs. Battaglia returned to Dr. Mars with reports of frequent headaches, neck and back pain, and some recent pain in her right hand and elbow. (Tr. 781). Physical examination was normal except a positive Tinel's sign at the cubital fossa. (*Id.*). Dr. Mars noted Mrs. Battaglia's liver issues limit the kinds of medications she can take, refilled her prescription for Percodan, and encouraged her to visit a pain management doctor. (Tr. 781-82).

On May 2, 2016, Mrs. Battaglia met with Lisa A. Brown, M.D., for chronic pain management. (Tr. 786). Mrs. Battaglia endorsed constant, aching low back and neck pain. (*Id.*). Relevant to her low back, she reported symptoms including flaring pain and stiffness without lower extremity numbness or weakness. (*Id.*). She endorsed neck pain, headaches, difficulty

---

[1]     Mrs. Battaglia's arguments pertain to the ALJ's evaluation of her physical impairments. (Pl.'s Br., ECF #11, PageID 4803 n.2). I therefore limit my review to the medical records relevant to her physical impairments.

sleeping, stiffness, and upper extremity numbness, weakness, and tingling. (Tr. 787). On spinal range of motion testing, Mrs. Battaglia had pain but was unrestricted. (Tr. 788). Motor strength, sensation, and reflexes were normal. (Tr. 789). After diagnosing Mrs. Battaglia with neck pain, cervical radiculitis, and narrowing of the lumbar intervertebral space, Dr. Brown ordered a cervical MRI. (*Id.*). The MRI revealed bony hypertrophies at C3-C4 and C4-C5 and disc osteophyte complex at C5-C6 and C6-C7, producing compromise of the foramen at those levels, and mild canal stenosis at C4-C5 through C6-C7. (Tr. 783).

Mrs. Battaglia returned to Dr. Brown on May 18, 2016, complaining of neck pain and stiffness, as well as upper extremity numbness, tingling, and weakness. (Tr. 790). She also endorsed headaches, and difficulty walking and sleeping. (*Id.*). Dr. Brown reviewed the MRI, diagnosed neck pain, cervical disc degeneration, and cervical radiculitis, and recommended an epidural injection. (Tr. 792-93).

On June 8, 2016, Mrs. Battaglia returned to Dr. Brown and reported 30% relief from neck and right arm pain, with feelings of weakness and jitteriness that gradually subsided. (Tr. 794). Dr. Brown felt Mrs. Battaglia was not a good candidate for injection therapy because of the side effects and low benefit. (*Id.*). In addition to neck and arm pain, Mrs. Battaglia endorsed chronic migraines accompanied by photophobia and phonophobia. (Tr. 794-95). Resting in a quiet, dark room and taking Percodan decreases the intensity of the headache but does not completely relieve it. (Tr. 795). Cervical spine range of motion testing reproduced neck pain and radicular symptoms with extension, flexion, and rotation. (Tr. 797). Additionally, Mrs. Battaglia displayed tenderness to palpation of the bilateral cervical paraspinous muscles and the right supraspinatus muscles. (*Id.*). Physical examination revealed decreased strength to the right arm with resisted shoulder

4

abduction, biceps extension, and wrist extension. (*Id.*). Mrs. Battaglia also had decreased sensation to the right arm in a C5-C6-C7 distribution with some hypertonicity of the deep-tendon reflexes, and a positive Spurling's test. (*Id.*). Dr. Brown diagnosed cervical radiculitis, cervical disorder with radiculopathy, and cervicogenic headaches. (Tr. 798). She prescribed Percodan for the cervical impairments and Topamax for headaches. (*Id.*). Dr. Brown noted the same abnormal physical examination findings on July 6 and August 1, 2016. (Tr. 803, 809). On July 26, lab work confirmed Mrs. Battaglia has Hashimoto's disease. (Tr. 858).

On August 1, 2016, Dr. Brown discontinued Mrs. Battaglia's prescription for Percodan because her endocrinologist felt the aspirin component of that medication was contributing negatively to Mrs. Battaglia's thyroid function. (Tr. 806). In place of Percodan, Dr. Brown prescribed oxycodone and limited Mrs. Battaglia to three doses per day. (*Id.*).

On October 3, 2016, Mrs. Battaglia returned to Dr. Brown for a refill of her medications. (Tr. 810). There, she endorsed 50% pain relief with medication and denied any major side effects. (*Id.*). She denied weakness in the upper extremities but endorsed throbbing joint pain in her knees and hands. (*Id.*). Mrs. Battaglia indicated she scheduled an appointment with a rheumatologist regarding her joint pain. (*Id.*). On physical examination, Mrs. Battaglia displayed normal motor strength, sensation, and reflexes, but endorsed pain with range of motion testing. (Tr. 813). On November 22, Mrs. Battaglia continued to endorse chronic neck pain, described as stiff, dull, and achy, as well as daily headaches that are tolerable most of the time. (Tr. 815). Mrs. Battaglia endorsed pain on range of motion testing; physical examination was otherwise unremarkable. (Tr. 818).

X-rays of Mrs. Battaglia's right foot, dated December 3, 2016, show mild hallux valgus with early bunion formation. (Tr. 898). On December 16, Mrs. Battaglia underwent a bunionectomy for correction of the hallux valgus deformity. (Tr. 1194).

On January 23, 2017, Mrs. Battaglia met with rheumatologist Rajul Desai, M.D. for hip and neck pain. (Tr. 913). She endorsed fatigue, red and dry eyes, dry mouth, joint pain and swelling, morning stiffness in the joints, muscle weakness, back pain, rashes, color changes in the skin with exposure to cold, hair loss, nail changes, headaches, numbness and tingling, allergies, thyroid disease, and high blood pressure. (Tr. 915-16). Physical examination was normal except Mrs. Battaglia displayed some joint line tenderness at both knees and mildly restricted cervical range of motion. (Tr. 917-18). Dr. Desai assessed Mrs. Battaglia with pain in both hands and chronic pain in both knees and ordered X-rays. (Tr. 919). Bilateral hand X-rays were normal. (Tr. 930). Knee X-rays revealed a small right patellar enthesophyte and were otherwise normal. (Tr. 931).

On January 25, 2017, Mrs. Battaglia returned to Dr. Brown for pain management and complained of neck pain and radiculopathy into her right upper extremity. (Tr. 987). On examination, Mrs. Battaglia displayed restricted cervical flexion and extension and a positive Spurling's test. (Tr. 990). Mrs. Battaglia noted the oxycodone was less effective than usual, prompting Dr. Brown to prescribe a muscle relaxer. (*Id.*). On February 22, Mrs. Battaglia endorsed pain with cervical rotation to the left and right. (Tr. 995). Physical examination was the same on March 22. (Tr. 1000). Citing nervousness about taking multiple medications, Mrs. Battaglia informed Dr. Brown that she did not start taking the muscle relaxer. (Tr. 997).

On May 16, 2017, Mrs. Battaglia met with orthopedic specialist John Feighan, M.D., to discuss her right foot pain post-bunionectomy. (Tr. 1450). She noted her podiatrist removed a pin from the foot on May 11, but the pain had not improved and increased with weightbearing. (*Id.*).

On July 10, 2017, Mrs. Battaglia met with rheumatologist Van Warren, M.D. (Tr. 1054). Physical examination revealed moderately limited extension and mildly limited right and left rotation of the cervical spine and slightly weakened grip strength bilaterally. (Tr. 1055). On July 14, a smooth muscle antibody screening was positive. (Tr. 760).

On August 11, 2017, Mrs. Battaglia returned to Dr. Feighan to discuss her continued pain over the lateral forefoot with walking and some pain with motion in the big toe. (*Id.*). Dr. Feighan reviewed her CT scan, dated August 4, which showed moderate degenerative changes of the middle facet of the subtalar joint with a corticated body at the medial periphery of the joint, and mild degenerative change of the first metatarsophalangeal joint and the hallux sesamoid articulations. (Tr. 1074). Dr. Feighan noted the CT scan "shows healing but incomplete healing of distal metatarsal osteotomy" and "mild 1st MTP arthrosis." (Tr. 1447). Dr. Feighan diagnosed acquired hallux valgus of the right foot, arthritis, and sesamoiditis. (*Id.*). He ordered physical therapy for gait training, supportive footwear, and use of a bone stimulator to promote further healing of the osteotomy. (*Id.*).

On November 20, 2017, Mrs. Battaglia met with Tina Barger, APRN-CNP, for pain management. (Tr. 1312). She endorsed worsening neck pain with muscle spasms, worsening pain with neck movement, and increasing numbness and tingling with accompanied weakness to the left fourth and fifth fingers. (*Id.*). Left wrist extension increased her left elbow pain. (*Id.*). On physical examination, Mrs. Battaglia displayed abnormal spinal range of motion, muscle tone, and

tremor. (Tr. 1314). CNP Barger noted painful range of motion testing, hypertonicity to the right cervical paraspinous muscle, decreased grip strength on the left, tenderness over the left lateral elbow, and decreased sensation to light touch to the left fourth and fifth fingers and ulnar surface of the hand and forearm. (Tr. 1314-15). CNP Barger prescribed a five-day course of prednisone to address her increased pain, paresthesia, and weakness; restarted Mrs. Battaglia on tizanidine; refilled her prescription for oxycodone; and encouraged her to start gabapentin. (Tr. 1312).

In December 2017, lab work confirmed elevated liver enzymes and a positive smooth muscle antibody panel. (Tr. 1305, 1307). On January 5, 2018, Mrs. Battaglia met with Dr. Warren and endorsed neck, back, left arm, and right foot pain; eye dryness; and left-hand numbness. (Tr. 1308). Dr. Warren observed a dry rash on her face and dry skin over the extensor aspect of her hands overlying the proximal interphalangeal (PIP) and metacarpophalangeal (MCP) joints. (*Id.*). Dr. Warren also noted Mrs. Battaglia's tests were positive for autoimmune thyroiditis and autoimmune hepatitis. (*Id.*). He concluded her sicca symptoms[2] and facial rash was also suggestive of possible Sjögren's syndrome. (*Id.*). He diagnosed autoimmune hepatitis and arthritis. (Tr. 1310).

On February 12, 2018, Mrs. Battaglia met with Dr. Brown for pain management and endorsed intermittent radicular cervical symptoms. (Tr. 1504). Dr. Brown discussed changing Mrs. Battaglia's muscle relaxer because with poor liver function she cannot take her current medication. (*Id.*). Physical examination revealed abnormal spinal range of motion but was otherwise unremarkable.

---

[2]     Sicca symptoms include dryness of the eyes, mouth, and other body parts. *See* Stedman's Medical Dictionary, Stedmans 882100 (updated Nov. 2014).

On February 13, Mrs. Battaglia met with rheumatologist Rochelle Rosian, M.D., for a second opinion about her Sjögren's syndrome. (Tr. 1416). There, Mrs. Battaglia reported knee and feet pain lasting all day, especially with weightbearing. (*Id.*). She endorsed excessive sweating, sicca symptoms, daily ocular migraines, dry mouth, muscle pain in the left upper arm, telangiectasia[3] over the face and chest, Raynaud's, and numbness and tingling in the left third finger. (Tr. 1416-17). Physical examination revealed left elbow tenderness and slight contracture, bilateral wrist tenderness, swelling and tenderness in the bilateral MCP joints, tenderness in the bilateral PIP joints, and tenderness to palpation of the right foot. (Tr. 1419). Dr. Rosian assessed Mrs. Battaglia with autoimmune hepatitis, elevated liver enzymes, Raynaud's disease without gangrene, and inflammatory poly arthropathy with sicca complex (and not Sjögren's syndrome) and agreed that Plaquenil (hydroxychloroquine) may be beneficial for her liver and her joints. (Tr. 1420).

On May 8, 2018, Mrs. Battaglia met with Dr. Warren and reported pain in her head, neck, back, bilateral knees, and bilateral feet. (Tr. 1458). Mrs. Battaglia also reported fatigue, significant eye and mouth dryness, and dry skin over her hands and the soles of her feet. (*Id.*). She informed Dr. Warren she had yet to start hydroxychloroquine because a hepatologist recommended a baseline liver biopsy first. (*Id.*). Dr. Warren referred her to hepatology to evaluate and advise for the need for any management of autoimmune hepatitis in light of her plans for initiating hydroxychloroquine. (Tr. 1462).

On June 29, 2018, Mrs. Battaglia returned to orthopedist Dr. Feighan. (Tr. 1541). She endorsed using the bone stimulator with resolution of the issues on the medial side of her foot.

---

[3]     Dilation of previously existing small or terminal vessels. *See* Stedman's Medical Dictionary, Stedmans 899720 (updated Nov. 2014).

(*Id.*). She continued to complain of pain at the joint of her small toe on the right foot, worse with movement and improved with rest. (*Id.*). Physical examination of the right foot revealed good range of motion with minimal swelling and tenderness to the lateral fifth metatarsal. (Tr. 1545). An X-ray showed a healed bunion medially and minimal spurring at the fifth metatarsal without significant structural issues. (Tr. 1546). Dr. Feighan discussed surgical options, including a right bunionette correction and fifth metatarsal exostectomy. (*Id.*).

On August 22, 2018, Mrs. Battaglia met with Dr. Brown for pain management and complained of a new symptom: severe burning into the left scapular region that worsens with breathing and moving her arm and neck. (Tr. 1573). She also described shooting pain in her right hand and index finger, issues with ocular migraines, and an overall feeling of weakness in the left upper extremity. (*Id.*). Physical examination revealed pain with palpation of the left cervical spine area, restricted cervical flexion, extension, and rotation, and global weakness in the upper left extremity compared to the right. (Tr. 1577). Dr. Brown prescribed a course of oral steroids and advised she would order a new cervical MRI if Mrs. Battaglia did not respond to the treatment. (Tr. 1573). Dr. Brown referred Mrs. Battaglia to neurology for her headaches. (Tr. 1578).

On October 17, 2018, an updated cervical MRI revealed cervical spondylosis resulting in varying severity of central canal and neural foraminal narrowing at multiple levels, worsened at C5-C6 and C6-C7 compared to the prior study. (Tr. 1611). Mrs. Battaglia returned to Dr. Brown on November 5, 2018 and reported very sharp neck pain radiating into the left upper extremity. (Tr. 274). Dr. Brown reviewed the updated MRI but decided not to change Mrs. Battaglia's medication until after she consulted with a surgeon. (*Id.*). Physical examination revealed painful cervical extension and rotation. (Tr. 277).

10

On November 9, 2018, Mrs. Battaglia returned to Dr. Warren's office and complained of headaches and pain in her mid-spine and knees. (Tr. 1642). Physical examination revealed slightly restricted cervical flexion, focal area tenderness on the lower aspect of the thoracic spine, and good muscle strength in the upper and lower extremities except for very slight weakness of the fourth digit of each hand and slight weakness to abduction of the left shoulder. (*Id.*). Dr. Warren ordered a hepatic function panel. (Tr. 1651).

On November 20, 2018, Mrs. Battaglia consulted with orthopedic surgeon Christopher Furey, M.D. (Tr. 2638). To Dr. Furey, Mrs. Battaglia described long-standing neck pain, daily chronic headaches, and intermittent left arm pain and numbness without weakness or loss of coordination. (*Id.*). Physical examination revealed some limited cervical spine range of motion with intact strength in the upper and lower extremities. (*Id.*). On review of her spinal imaging, Dr. Furey noted moderate degenerative changes at C5-C6 with slight focal kyphosis, mild spondylitic changes at C5-C6 and C6-C7, and bilateral foraminal stenosis. (*Id.*). In the absence of severe radicular symptoms and myelopathic features, Dr. Furey recommended non-surgical treatment. (*Id.*).

On December 3, 2018, Mrs. Battaglia returned to Dr. Brown for pain management, complaining of ongoing neck, mid-back, and low back pain. (Tr. 1627). Even with four daily doses of oxycodone, Mrs. Battaglia stated the medication was only 50% effective for her pain. (*Id.*). She reported inability to manage her daily activities without help from her husband. (*Id.*). On physical examination, Mrs. Battaglia displayed pain with palpation of the facet joints of the cervical, thoracic, and lumbar spine and pain with extension. (Tr. 1630). Dr. Brown felt her pain was most consistent with spondylosis of the neck, mid-back, and low back. (Tr. 1627). Dr. Brown diagnosed

11

cervical spondylosis, cervical disc disorder with radiculopathy, narrowing of the lumbar intervertebral disc space, and lumbar spondylosis. (Tr. 1631). Dr. Brown increased her dose of oxycodone and recommended physical therapy and exercise. (*Id.*).

Mrs. Battaglia returned to pain management on January 2, 2019, reporting her muscle spasms as well-controlled with cyclobenzaprine and experiencing 70% relief from chronic neck pain with the increased oxycodone dose. (Tr. 2693). Medication improved her function such that she could manage her daily activities independently. (*Id.*).

On March 5, 2019, Mrs. Battaglia met with Dr. Warren and complained of ocular migraines with blurred vision; neck pain with recurrent numbness in the third, fourth, and fifth digits of the left hand; pain in the shoulders, knees, and left ankle; and dry eyes and mouth. (Tr. 3228). Physical examination revealed focal tenderness on the posterior lateral aspect of the left ankle, and slightly diminished muscle strength in the left upper extremity and right hip flexor. (*Id.*). Dr. Warren noted Mrs. Battaglia's positive ANA, positive anti-smooth muscle antibody, sicca symptoms, recurrent rashes, and arthralgias suggestive of Sjögren's syndrome. (*Id.*). Dr. Warren prescribed hydroxychloroquine. (Tr. 3238).

A lumbar MRI from May 1, 2019, revealed mild multifocal degenerative changes, including hypertrophic facet changes, diffuse disc bulges, and a posterior annular tear. (Tr. 2391). Dr. Brown reviewed the MRI and noted Mrs. Battaglia's complaints, including mid-back pain that worsens with bending, twisting, and standing while doing dishes, increased left thigh pain and numbness with standing and walking, and extreme fatigue that Dr. Brown attributed to Sjögren's syndrome. (Tr. 2683). Mrs. Battaglia also reported falling twice due to leg weakness. (*Id.*). She discontinued Flexeril because it was not effective for her muscle spasms and started taking Topamax. (*Id.*).

Physical examination revealed tenderness to palpation of the thoracic spine at T11 and T12, mild muscle hypertonicity to the right and left of the thoracic paraspinous muscles, tenderness to palpation of the lumbar spine at L4, decreased sensation to light touch on the left thigh, and weakness with resisted left hip flexion and left ankle dorsiflexion. (Tr. 2686-87). Dr. Brown diagnosed cervical spondylosis, cervical radiculitis, cervical disc disorder with radiculopathy, lumbar spondylosis, and thoracic back pain. (Tr. 2688). She ordered a thoracic MRI that showed mild degenerative changes without significant stenosis. (Tr. 2102-03).

On July 2, 2019, Mrs. Battaglia saw Dr. Warren and complained of recurrent dry skin and rash, finger discoloration with cold exposure, pain in the knees, neck, left arm, and left leg, and chronic left scapular region numbness. (Tr. 3221). Dr. Warren noted a faint erythema and dry flaky skin on Mrs. Battaglia's face and some weakness in her neck flexors and left hip flexor. (*Id.*). He determined Mrs. Battaglia's radicular symptoms involving the left upper and lower extremities are likely related to her cervical and lumbar radiculopathy. (*Id.*). Dr. Warren ordered additional lab work. (Tr. 3226-27).

In September 2019, Mrs. Battaglia reported continued throbbing headaches despite the oxycodone. (Tr. 2678). On October 3, 2019, she met with neurologist Stephen Samples, M.D., for headaches that she described as constant with throbbing exacerbations, photophobia and phonophobia, and worsened with movement. (Tr. 2921). She reported being unable to tolerate numerous medications. (*Id.*). Dr. Samples noted markedly increased neck muscle tone. (*Id.*). He prescribed Axert, an abortive medication, and zonegran, the only remaining oral medication for headache relief available to Mrs. Battaglia, and strongly encouraged her to join a chronic pain program. (*Id.*).

13

On December 11, 2019, at a pain management office visit, Mrs. Battaglia reported she weaned herself down to one or two oxycodone tablets a day and noted a significant reduction in headaches, but also increased joint pain. (Tr. 2805). She also reported taking hydroxychloroquine for Sjögren's syndrome and Topamax and Flexeril for headaches. (*Id.*). She received a prescription for Celebrex to address joint pain. (*Id.*).

On January 15, 2020, Mrs. Battaglia met with neurologist Dr. Samples and reported being unable to tolerate zonegran due to gastrointestinal side effects. (Tr. 2935). She also reported decreasing her daily dose of oxycodone but endorsed continued daily headaches. (*Id.*). Because insurance did not cover Axert, Dr. Samples prescribed another abortive medication Maxalt. (*Id.*). He also recommended Botox injections, administered on February 18, 2020. (*Id.*).

During a February 2020 office visit with her family doctor, Mrs. Battaglia reported taking hydroxychloroquine five days a week that helped clear her skin but did not relieve her pain or fatigue. (Tr. 2862). She also reported burning pain in her legs that is relieved only by lying down. (*Id.*).

On February 19, 2020, Mrs. Battaglia attended a neurological consultation with Robert Kosmides, M.D., and reported neck and arm pain. (Tr. 2872). Physical examination was normal except reduced sensation to pinprick at the left scapula and a slow tandem gait. (Tr. 2877). Dr. Kosmides assessed cervical radiculopathy, for which he recommended acupuncture, and possible small fiber neuropathy, for which he ordered lab work and prescribed alpha lipoic acid. (Tr. 2872).

On March 17, 2020, Mrs. Battaglia met with Dr. Warren and complained of a burning sensation in her lower extremities, recurrent rash and dry skin, drooping of the left upper eyelid, slightly blurred vision, and pain in the lateral aspect of her thigh. (Tr. 2251). Dr. Warren observed

dry, scaly skin on her forehead, palms, and hands, mild tenderness at the shoulders and thighs, and focal tenderness at the proximal lateral aspect of the right thigh. (*Id.*). He noted a history of M protein, autoimmune hepatitis, fatty liver, Sjögren's syndrome, and paresthesias in the lower extremities, suggestive of neuropathy. (*Id.*). Dr. Warren increased her dose of hydroxychloroquine and ordered additional lab work. (Tr. 2252).

On August 20, 2020, during an appointment with pain management, Mrs. Battaglia reported increased lateral right-sided hip pain with all movement. (Tr. 3270). Physical examination showed right-sided hip impingement and abnormal spinal range of motion. (Tr. 3270, 3273). Hip imaging revealed no acute process. (Tr. 3281). On November 20, Mrs. Battaglia received an increased prescription for oxycodone and a referral to physical therapy for low back pain. (Tr. 3277).

On August 14, 2020, Mrs. Battaglia complained of generalized pain, significant fatigue, and an inability to tolerate anti-epileptic medications, such as gabapentin, for small fiber neuropathy pain. (Tr. 2221). Dr. Warren ordered additional lab work to determine if she can take anti-metabolite demarcated medications. (*Id.*). During a telehealth visit on November 23, 2020, Mrs. Battaglia complained of multiple joint pain. (Tr. 2192). Dr. Warren continued her medications. (*Id.*).

On February 1, 2021, Mrs. Battaglia met with neurologist Dr. Kosmides and complained of a burning sensation in her legs and pain in her shins when getting out of bed. (Tr. 2054). She reported the medication prescribed for neuropathy made her feel nervous and discontinued it within a few days. (*Id.*). A limited physical examination was normal, revealing a slow tandem gait.

15

(Tr. 2056). Dr. Kosmides prescribed carbamazepine pending approval of the doctor overseeing Mrs. Battaglia's liver disease. (Tr. 2054).

On February 5, 2021, Mrs. Battaglia reported paresthesias in her legs and, after noting some continued problems with Mrs. Battaglia's gait, Dr. Brown ordered an updated MRI. (Tr. 2100). At a follow-up visit on April 30, 2021, Dr. Brown continued Mrs. Battaglia's medications. (Tr. 2153).

A cervical spine MRI from July 14, 2021 revealed mild neuroforaminal narrowing at multiple levels and mild facet hypertrophy at C5-C6 and mild central canal stenosis at C6-C7. (Tr. 4634). On August 2, 2021, Mrs. Battaglia met with Dr. Warren and complained of locking digits in her right hand, increased numbness and paresthesia in the upper extremities, right more than left, and increased gastrointestinal symptoms. (*Id.*). She reported decreasing her dose of hydroxychloroquine to relieve the gastrointestinal symptoms but noticed a subsequent increase in pain and intermittent swelling involving her hands, wrists, ankles, feet, knees, and shoulders. (*Id.*). Dr. Warren prescribed azathioprine. (Tr. 4635).

## III. MEDICAL OPINIONS

Upon initial assessment of Mrs. Battaglia's claim on May 4, 2017, State agency medical consultant Abraham Mikalov, M.D., reviewed her medical records and opined she could lift and carry twenty pounds occasionally, ten pounds frequently; stand and walk about six hours and sit more than six hours on a sustained basis in an eight-hour workday; never climb ladders, ropes, or scaffolds; and frequently stoop, kneel, crouch, and crawl. (Tr. 575-76).

On reconsideration on July 13, 2017, State agency medical consultant David Knierim, M.D., reviewed updated medical records and adopted the opinions of Dr. Mikalov, but

additionally restricted Mrs. Battaglia to frequent pushing and pulling with the right lower

extremity to account for pain in the plantar metatarsophalangeal joint while walking; frequent

overhead reaching in light of her cervical spondylosis, mild canal stenosis, and cervicalgia; frequent

handling due to elbow pain; and no exposure to hazards such as dangerous machinery and

unprotected heights. (Tr. 594-95).

> The ALJ evaluated the opinions and accorded them partial weight:
>
> They found the claimant could do light work. They found the claimant could
> frequently stoop, kneel, crouch, and crawl and never climb ladders, ropes, or
> scaffolds. Dr. Knierim also found the claimant could frequently push and pull with
> the right lower extremity. Dr. Knierim found the claimant could frequently handle
> and had limited overhead reaching. He also found the claimant should avoid all
> exposure to hazards such as unprotected heights and dangerous heavy machinery.
> These opinions were based on a review of the record. The record did support a
> finding of limiting the claimant to light work with postural and environmental
> limitations based on her ongoing treatment for pain, but with generally intact gait,
> strength, and sensation on examination. However, her treatment records supported
> some additional limitations with the use of the right lower extremity.

(Tr. 1689).

In June 2018, Dr. Warren completed a medical source statement and opined Mrs.

Battaglia can lift and carry ten pounds occasionally, five pounds frequently; stand and walk for a

total of four hours a day and one hour without interruption; occasionally climb; rarely balance,

stoop, kneel, crouch, and crawl; and occasionally reach, push/pull, and perform fine and gross

manipulation. (Tr. 1490-91). Additionally, Dr. Warren concluded Mrs. Battaglia should avoid

heights and temperature extremes; requires the ability to alternate between sitting and standing;

has moderate pain that would interfere with concentration, take her off task, and cause

absenteeism; and must be able to elevate her legs to 45 degrees. (Tr. 1491). On the medical source

statement, Dr. Warren supported his opinions by noting Mrs. Battaglia's pain. (1490-91). The ALJ

gave the opinion little weight:

> There was nothing in the medical record to explain why the claimant needed to be
> able to elevate her legs. His opinion relied heavily on her subjective reports of pain
> rather than citing to objective medical findings.

(Tr. 1692).

IV.    OTHER RELEVANT EVIDENCE

On March 29, 2017, Mrs. Battaglia reported to a State agency Disability Determination

Services (DDS) representative that her daily activity is limited due to pain, and her husband does

the cooking, cleaning, and shopping for the household. (Tr. 706). She reported requiring

assistance with personal care, showering once a week, and using a walker on "really bad" days. (*Id.*)

She endorsed being able to sit for about an hour at a time if the chair is comfortable and stand for

about five minutes at a time. (*Id.*). She claimed to be able to drive sometimes, but not on days

when she cannot turn her head. (*Id.*). Mrs. Battaglia endorsed getting along well with others and

socializing with family and friends about twice a week. (*Id.*). She reported difficulty concentrating

due to headaches and pain. (*Id.*).

On May 31, 2017, Mrs. Battaglia reported spending most days in her adjustable bed that

helped with her neck and back pain. (Tr. 718). She affirmed her husband does the cooking,

shopping, and housework, and reported that he changed their doorknobs to handles because she

was unable to turn the knobs with her hands. (*Id.*). She also described difficulty opening containers

with her hands and dropping items from her grasp. (*Id.*). She endorsed pain in her neck that

radiates down her arm and into her hand, and pain in her elbows, knees, feet, and hips, all of

which make it difficult to do anything. (*Id.*).

V.    ADMINISTRATIVE HEARING

At the first administrative hearing on December 12, 2018, Mrs. Battaglia testified that her fatigue and chronic pain prevent her from working full-time. (Tr. 544). She experiences fatigue as a result of her autoimmune conditions, including autoimmune hepatitis,[4] Sjögren's syndrome, and Hashimoto's disease, noting it does not take a lot of activity to tire her out. (Tr. 545, 552). Her liver issues limit the kinds of medication she can take. (Tr. 546, 556). She has headaches and pain in her neck, knees, ankles, feet, left arm, and right hip. (Tr. 545). The headaches stem from the neck. (Tr. 556). Mrs. Battaglia testified she has tried physical therapy, numerous medications and adjustments, and epidural steroid injections to relieve her pain. (Tr. 545).

Mrs. Battaglia's husband does a lot to maintain the household, including chores, shopping, and cooking. (Tr. 547). Her son and daughter-in-law purchased the house next door and help out often. (Tr. 547). She tries to do some chores on good days, like loading the dishwasher and folding laundry in her lap but must be careful not to aggravate her pain. (Tr. 547). For instance, Mrs. Battaglia sneezed and was bed-ridden for several days, prompting her pain management doctor to prescribe steroids. (Tr. 547). Doing anything while holding her arms out in front of her, such as driving, standing at the counter or stove, or chopping vegetables aggravates her neck pain. (Tr. 547-48, 552).

On a typical day, Mrs. Battaglia awakens between 8:00 a.m. and 10:00 a.m., depending on how well she slept. (Tr. 549). She immediately takes a pill and stays in bed to let the medicine start working. (Id.). When she gets out of bed, she goes downstairs to watch television. (Id.). If she is

---

[4]    Prior to 2006, Mrs. Battaglia received disability benefits for fifteen years based on her autoimmune hepatitis. (Tr. 554). When the disease went into remission, she obtained a job as a financial aid counselor. (Id.).

having a really good day, she will drive ten minutes to the drive-thru pharmacy to pick up prescriptions, load the dishwasher, and try to do little things. (*Id.*). On bad days, Mrs. Battaglia spends her time trying to find a comfortable position to relieve the pain. (Tr. 550). Often, Mrs. Battaglia stays in her adjustable bed because it is the only place she finds any relief. (Tr. 550). Sjögren's syndrome causes dry and peeling skin, fatigue, and joint pain in her knees, ankles, hands, and feet. (Tr. 556-57). On some days, her ankles and knees feel like they are on fire and ache. (Tr. 556). She experiences tingling and numbness in her left arm. (Tr. 559). Mrs. Battaglia identified her cervical spine as the main condition preventing her from working. (Tr. 560). She has a constant headache varying in intensity and, as a result, does not read much anymore. (Tr. 550).

VE Thomas Nimberger identified Mrs. Battaglia's past relevant work as a composite job. (Tr. 561). Mrs. Battaglia's first function, financial aid/loan counselor, is classified as financial aid counselor (DOT #169.267-018, sedentary exertion as generally performed, light exertion as actually performed, SVP 5). (Tr. 561). The second function, manning the front desk, is classified as front desk receptionist (DOT #237.367-038, sedentary exertion as generally and actually performed, SVP 3). (Tr. 562). The composite job, financial aid/loan counselor front desk receptionist, does not exist in the DOT, but Mrs. Battaglia performed this SVP 5 job at the light exertion level. (*Id.*).

The ALJ asked the VE if a hypothetical individual of Mrs. Battaglia's age, education, and experience could perform her past relevant work if limited to light exertion and subject to the following restrictions: never climb ladders, ropes, or scaffolds; frequently stoop, kneel, crouch, and crawl; frequently reach overhead bilaterally; avoid all exposure to hazards such as unprotected heights and dangerous machinery; frequently push and pull with the right lower extremity;

occasional interaction with supervisors, coworkers, and the public; and occasional routine workplace changes. (Tr. 562-563). The VE testified the hypothetical individual could not perform Mrs. Battaglia's past relevant work, but identified three light exertion, SVP 2, unskilled positions, including: office cleaner (DOT #323.687-014, 60,000 national jobs); packager (DOT #559.687-074, 19,000 national jobs); and bench assembler (DOT #706.684-022, 79,000 jobs nationally).

If the hypothetical individual was further restricted to occasional bilateral overhead reaching, upper extremity pushing and pulling, and grasping, gripping, and pinching, the individual would be unable to perform any light work because the limitations diminish the light job base and the restriction to occasional interaction with others takes away from that small job base. (Tr. 566).

At the second administrative hearing on October 15, 2021, Mrs. Battaglia testified she remains unable to work because of her chronic pain, anxiety, and fatigue. (Tr. 1725). Her legs constantly feel like they are burning, her right foot hurts like a toothache all day, and she experiences neck pain causing headaches and radiating into her arms, causing tingling and numbing. (*Id.*). The tingling, numbing sensation wakes her from sleep and also occurs during the day, causing her to drop things she is holding. (Tr. 1738). She naps at least once a day because dealing with the pain and anxiety physically exhausts her. (Tr. 1726). Some days, she wakes up feeling as though her nerves are jumping out of her skin. (*Id.*). She continues to have headaches for which Botox injections were not effective. (Tr. 1728). Due to liver issues, Ms. Battaglia remains unable to take medications that might otherwise be helpful. (Tr. 1726-27). There are other medications she cannot take or can only take a limited dose because they increase her anxiety. (Tr. 1728). Mrs. Battaglia takes oxycontin to help manage her musculoskeletal pain. (Tr. 1729). A

higher dosage of oxycontin exacerbates her headache, but a lower dose does not help to control her pain. (Tr. 1729). Mrs. Battaglia's autoimmune disorders cause joint pain, fatigue, dry eyes and mouth, and scaly, dry skin. (Tr. 1736).

After Mrs. Battaglia's husband was injured in an accident, their son and daughter-in-law began helping them with household chores, bringing them meals, and picking up groceries. (Tr. 1730). When Mrs. Battaglia wakes up with anxiety, she does not know what to do with herself and stays in bed. (Tr. 1733). On days when she does not have as much anxiety but is in a lot of pain, she gets up from bed and alternates between a chair with lumbar support and a chair with a stool in front of it to elevate her legs. (Tr. 1733). She watches television without sound because the noise hurts her head. (Tr. 1727). When she gets stiff, she moves around a bit and sits back down. (Tr. 1734). Mrs. Battaglia does not engage in hobbies or do anything else for fun because "[i]t's hard to have fun when you're miserable[.]" (Tr. 1734).

The ALJ posed a hypothetical individual of Mrs. Battaglia's age, education, and experience with the same restrictions as those posed at the first hearing in 2018, to which the VE testified the hypothetical individual could not perform Mrs. Battaglia's past relevant work. (Tr. 1739-40). The VE identified other light exertion, unskilled jobs the hypothetical individual could perform, including officer cleaner (DOT #323.687-014, 220,000 jobs nationally), mail clerk (DOT #209.687-026, 12,000 jobs nationally), and bench assembler (DOT #706.684-022, 320,000 jobs nationally). (Tr. 1740-41).

If the hypothetical individual was further restricted to standing and walking no more than four hours in an eight-hour workday and lifting no more than five pounds frequently, ten pounds occasionally, the individual would be restricted to sedentary exertion work. (Tr. 1741).

If, based on the restrictions of the original hypothetical, the individual was further restricted to occasional reaching in all directions, occasional pushing and pulling with the upper extremity, and occasional performance of fine and gross manipulation, the individual would not be able to perform any light work because the limitations themselves diminish the job base and the restriction to occasional interaction with others eliminates the diminished job base. (Tr. 1742).

Based on the restrictions of the original hypothetical, Mrs. Battaglia's counsel asked the VE if the need to elevate the legs throughout the workday is work preclusive. (Tr. 1743). The VE testified the need to elevate her legs to 45 degrees is not work preclusive, but the need to elevate her legs to 90 degrees is work preclusive. (Tr. 1743-44). An accommodation from the employer would be necessary if the individual required, in addition to regular breaks, extra rest periods totaling one hour. (Tr. 1744). Finally, the VE testified an individual could not sustain work activity if she was absent from work two or more days a month). (Tr. 1744-45).

### THE ALJ'S DECISION

The ALJ's decision included the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2022.

2. The claimant has not engaged in substantial gainful activity since the alleged onset date, December 16, 2016 (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: dysfunction of major joints, degenerative disc disease, autoimmune hepatitis, depressive disorder, and obsessive-compulsive disorder. (20 CFR 404.1520(c)).

4. Since the alleged onset date, that claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.  After careful consideration of the entire record, I find that since the alleged onset date, the claimant had the residual functional capacity to perform light work except frequently push and/or pull with the right lower extremity; never climb ladders, ropes, or scaffolds; frequently stoop, kneel, crouch, and crawl; frequent overhead reaching bilaterally; never be exposed to hazards such as unprotected heights or dangerous machinery; occasional interaction with supervisors, coworkers, and the public; limited to occasional routine workplace changes.

6.  Since the alleged onset date, the claimant was unable to perform any past relevant work. (20 CFR 404.1565).

7.  Prior to October 31, 2021, the claimant was closely approaching advanced age. On October 31, 2021, the claimant's age category changed to advanced age. (20 CFR 404.1563).

8.  The claimant has at least a high school education. (20 CFR 404.1564).

9.  Prior to the alleged onset date, the claimant's acquired job skills do not transfer to other occupations, OR the claimant within the residual functional capacity defined above (20 CFR 404.1568). Beginning on the established onset date, the claimant has not been able to transfer job skills to other occupations. (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Prior to October 31, 2021, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11. Beginning on October 31, 2021, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform. (20 CFR 404.1560(c) and 404.1566).

12. The claimant was not disabled prior to October 31, 2021, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g)).

(Tr. 1669-98).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of

evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

Even if substantial evidence supports the decision, a district court will not uphold that decision when the ALJ failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision ... will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right"); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004) (Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights). Furthermore, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11:13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner

26

follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Mrs. Battaglia claims the ALJ erred in (1) her evaluation of Dr. Warren's opinion under the treating physician rule and (2) erred in the assessment of her RFC, particularly by not including more robust upper extremity limitations. (Pl.'s Br., ECF #11, PageID 4821, 4825). Regarding Dr. Warren's opinion, she takes issue with the ALJ's stated rationale that the opinion

27

relied heavily on subjective reports of pain rather than citing to objective medical findings and argues his opinion was entitled to controlling weight because it was well-supported by diagnostic evidence and clinical findings and was not inconsistent with other substantial evidence in the record. (*Id.* at PageID 4822-23). Mrs. Battaglia also claims the RFC assessment is not supported by substantial evidence because the ALJ did not "look to an actual medical basis for limitations, ignored portions of the medical and opinion evidence, and wholly devalued, without basis, the claimant's reported symptoms." (*Id.* at PageID 4825).

In response, the Commissioner argues that when a treating physician's opinions are merely based on subjective complaints, as Dr. Warren's are, the ALJ's decision to discount the opinion is generally upheld. (Comm'r's Br., ECF #13, PageID 4870-71). The Commissioner also argues the ALJ adequately explained his reasoning for giving the opinion little weight by considering the relevant evidence and indirectly attacking both the consistency and supportability of the opinion. (*Id.* at PageID 4873). As to the RFC, the Commissioner claims the ALJ's assessment is based on a review of all relevant evidence and is supported by substantial evidence, including objective medical and opinion evidence. (*Id.* at PageID 4875-76).

For the reasons discussed below, I conclude the ALJ did not properly evaluate Dr. Warren's medical opinion.

Under the regulations applicable when Mrs. Battaglia first filed her claim, treating source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §

404.1527(c)(2).[5] If an ALJ does not accord controlling weight to a treating physician's opinion, the ALJ must weigh the opinion based on the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, whether the treating physician is a specialist, the physician's understanding of the disability program and its evidentiary requirements, the physician's familiarity with other information in the record, and other factors that might be brought to the ALJ's attention. 20 C.F.R. § 404.1527(c)(2)-(6). Nothing in the regulations requires the ALJ to explain how she considered each of the factors. *See* 20 C.F.R. § 404.1527(c). However, to safeguard a claimant's procedural rights and permit meaningful review, the ALJ must at least explain the ultimate weight assigned to the opinion. *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011).

The ALJ must give good reasons for the weight afforded to a claimant's treating source's medical opinion. 20 C.F.R. § 404.1527(c)(2). Good reasons for giving a treating source's opinion less-than-controlling weight include: (1) a lack of support by medically acceptable clinical and laboratory diagnostic techniques; and (2) inconsistency with other substantial evidence in the case record (including contrary findings in the treating source's own records). *See Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 786 (6th Cir. 2017) ("An ALJ is required to give controlling weight to a treating physician's opinion, so long as that opinion is supported by clinical and laboratory diagnostic evidence [and] not inconsistent with other substantial evidence in the record.") (citing 20 C.F.R. § 404.1527(c)(2)); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).

---

[5]     Effective March 27, 2017, new regulations replaced the treating physician rule. *See* 20 C.F.R. § 404.150c; *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017).

In the Sixth Circuit, "it is not enough to dismiss a treating physician's opinions as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." *Friend v. Comm'r of Soc. Sec.*, 375 Fed. App'x 543, 552 (6th Cir. 2010). When the ALJ does not adequately explain the weight given to a treating physician's opinion, or otherwise fails to provide good reasons for giving less-than-controlling weight to a treating physician's opinion, remand is appropriate. *Cole*, 661 F.3d at 939; *see also Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009) (holding that the failure to identify good reasons affecting the weight given to an opinion "denotes a lack of substantial evidence, even whe[n] the conclusion of the ALJ may be justified based upon the record") (internal quotation omitted); *see also Patterson v. Astrue,* No. 5:09-cv-1566, 2010 WL 2232309, *13 (N.D. Ohio Jun. 2, 2010) (remanding where the ALJ does not provide rationale beyond his conclusory statement that the opinion is inconsistent with the objective medical evidence and appears to be based solely on subjective complaints.).

Here, the ALJ found no support in the medical record explaining a need for Mrs. Battaglia to elevate her legs, a point she concedes. (Tr. 1692; *see also* Pl.'s Br., ECF #11, PageID 4823). The absence of evidence supporting a limitation is a proper reason to discount the opinion so long as the conclusion is supported by substantial evidence. *Biestek*, 880 F.3d at 786. The ALJ discounted Dr. Warren's other opined limitations because he relied heavily on subjective reports of pain. (*Id.*). I find this to be an overly broad and conclusory finding. *See Patterson*, 2010 WL 2232309, at *13. While it is accurate that Dr. Warren did not cite objective medical evidence on the medical source statement form, Dr. Warren's treatment records do contain objective medical evidence and clinical findings supportive of his opinions. (*See* Tr. 760, 1055, 1308, 1314-15, 1458, 1642, 2221, 2251,

3221). Within her evaluation of the medical opinion, the ALJ does not cite any of these objective findings, which include lab results confirming autoimmune issues, findings of limited range of motion, muscle weakness, diminished grip strength, and the like.

The Commissioner correctly points out if an ALJ refers to evidence elsewhere in her decision undercutting a medical opinion, the ALJ's failure to refer to this evidence during the evaluation of that medical opinion does not run afoul of the regulations. *See Crum v. Comm'r of Soc. Sec.,* 660 Fed. App'x 449, 457 (6th Cir. 2016). However, in this case, the objective medical evidence and clinical findings the ALJ summarized contain findings both supportive and not supportive of, as well as consistent and inconsistent with, Dr. Warren's opinions. For instance, the ALJ noted some intact range of motion testing, but also noted Mrs. Battaglia more often had restricted range of motion. (Tr. 1682). The ALJ noted largely intact sensation but instances where she had reduced sensation in the upper arm and left thigh. (*Id.*). The ALJ pointed to numerous findings of intact strength, but also noted some instances of left sided weakness affecting strength in Mrs. Battaglia's arm, shoulder, fingers, and leg, and instances of neck and hip weakness. (*Id.*). She noted normal grip strength findings as well as findings of weakened grip strength. (*Id.*). In short, the ALJ summarized the evidence, but the summarization does not allow the Court to trace the ALJ's path of reasoning given the lack of indication as to how the ALJ weighed this evidence. While the ALJ concluded the MRIs did not correlate with Mrs. Battaglia's symptoms, the ALJ did not offer such a conclusion related to the other clinical findings, leaving this Court to wonder what specific evidence the ALJ relied on to determine the weight assigned to Dr. Warren's opinion, especially in light of the regulations, which state:

> Imaging and other diagnostic tests can provide evidence of physical abnormalities; however, these abnormalities may correlate poorly with your symptoms, including

31

pain, or with your musculoskeletal functioning. Accordingly, we will not use findings on imaging or other diagnostic tests as a substitute for findings on physical examination about your ability to function, nor can we infer severity or functional limitations based solely on such tests.

20 C.F.R. Part 404, Subpart P, Appendix 1, 1.00C(3)(c). The ALJ's failure to articulate her reasoning in full regarding these findings deprives the Court of the ability to conduct a meaningful review of the ALJ's evaluation of Dr. Warren's opinion. As such, I find the claim must be remanded for additional proceedings consistent with this opinion.

In light of my decision to remand, I decline to address Mrs. Battaglia's remaining argument regarding the ALJ's RFC assessment. *See, e.g., Maddox v. Astrue,* No. 3:10CV159, 2011 WL 1990588, at *13 (S.D. Ohio May 2, 2011), *report and recommendation adopted,* 2011 WL 1988537 (S.D. Ohio May 23, 2011) (declining to address plaintiff's remaining arguments after finding "that the ALJ's decision should be reversed for failure to properly consider plaintiff's obesity consistent with SSR 02-1p").

### CONCLUSION

Following review of the arguments presented, the record, and the applicable law, I **REVERSE** the Commissioner's decision denying disability insurance benefits and **REMAND** this matter for proceedings consistent with this opinion.

Dated: June 8, 2023

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE